EMAS, J.,
dissenting.
I respectfully dissent from the denial of Appellant’s motion, which seeks rehearing en banc and certification of the question to the Florida Supreme Court as one of great public importance. I believe that this court should grant rehearing en banc and, for the reasons expressed herein, should hold that the decision in Miller v. Alabama, — U.S.-, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), applies retroactively to cases already final on direct appeal. Regardless of the merits decision, I believe that this court should certify the question to the Florida Supreme Court as one of great public importance.
The question presented is whether the rule announced in Miller v. Alabama should be applied retroactively to cases already final on direct appeal.
In 2000, Geter (a juvenile at the time of his offense) was arrested and charged with first-degree murder. In 2003, he was con *386 victed, and the trial court imposed a mandatory, non-discretionary sentence of life imprisonment without the possibility of parole. No sentencing hearing was held or required before imposition of the sentence, as the sentence imposed was mandated by section 775.082, Florida Statutes (2000),[1] and the trial court was without discretion to impose any sentence other than life without parole.
In 2004, this court affirmed Geter’s conviction and sentence, and several postcon-viction motions thereafter were denied by the trial court and affirmed by this court.
In 2012, the United States Supreme Court held in Miller that a sentence of “mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment’s prohibition on ‘cruel and unusual punishments.’ ” Miller, 132 S.Ct. at 2460.
Thereafter, Geter filed a pro se motion for postconviction relief, asserting that the decision in Miller should be applied retroactively, and that he therefore is entitled to an individualized sentencing proceeding at which he can present (and the trial court can consider) mitigating evidence in support of a sentence of something less than life in prison without the possibility of parole. The trial court denied the motion and Geter filed a pro se appeal. A panel of this court affirmed, holding Miller should not be applied retroactively. Geter v. State, 115 So.3d 375 (Fla. 3d DCA 2012).
I believe rehearing en banc is appropriate for the following reasons:
1. The procedural posture of Geter, and the significance of the issue presented, warrants en banc consideration;
2. The procedural posture of Miller signals a clear intention by the United States Supreme Court to apply Miller retroactively;
3. The Miller Court’s equating of a juvenile’s mandatory life-without-parole sentence to an adult death sentence signals a clear intention by the United States Supreme Court to apply Miller retroactively;
4. The new rule announced in Miller is based upon a series of decisions which have been applied retroactively by the Florida Supreme Court; and
5. The decision in Miller constitutes a development of fundamental significance, not a mere evolutionary refinement of the law and, pursuant to Witt v. State, 387 So.2d 922 (Fla.1980), should be applied retroactively.
1. The procedural posture of Geter, and the significance of the issue presented, warrants en banc consideration.
Geter prosecuted the appeal on his own, and the merits portion of his pro se brief was merely two pages. No briefing was ordered from the State, and no oral argument was held. Following issuance of the panel opinion affirming the trial court, a notice of appearance was filed by counsel *387 (presumably pro bono) together with a motion for rehearing, rehearing en banc, or for certification to the Florida Supreme Court. Given the exceptional importance of the issue presented in this case, en banc consideration under Florida Rule of Appellate Procedure 9.381(d)(1) is warranted, including appointing counsel for Geter (if current counsel does not wish to proceed further), a full briefing from the parties, and oral argument.
2. The procedural posture of Miller signals a clear intention by the United States Supreme Court to apply Miller retroactively.
Miller involved two appeals consolidated by the Supreme Court. Defendant Miller arrived at the Supreme Court on a petition for writ of certiorari following an unsuccessful direct appeal to the Alabama Supreme Court. Miller’s case was therefore not yet final on direct appeal. However, the case of the second defendant, Kuntrell Jackson, was already final on direct appeal, arriving at the United States Supreme Court following the Arkansas trial court’s dismissal of his postconviction petition for writ of habeas corpus (and the affirmance of that ruling by the Arkansas Supreme Court). In other words, for Jackson to prevail on his claim, the Supreme Court would implicitly have to find (at least for Jackson) that its decision would be applied to cases which are already final on direct appeal. In reversing the Arkansas Supreme Court’s decision, the United States Supreme Court did just that. By applying the newly-announced rule to Jackson’s ease on collateral review, the Supreme Court’s decision would appear to compel its application to other defendants whose cases are already final on direct appeal. In Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), the case in which the Supreme Court fashioned the retroactivity analysis currently in use in federal court and many state courts, the United States Supreme Court recognized this very principle:
[Ojnce a new rule is applied to the defendant in the case announcing the rule, evenhanded justice requires that it be applied retroactively to all who are similarly situated.
Id. at 300 (emphasis added). The Supreme Court explained, by its holding, the effect of a determination that a new rule is to be applied retroactively:
We therefore hold that, implicit in the retroactivity approach we adopt today, is the principle that habeas corpus cannot be used as a vehicle to create new constitutional rules of criminal procedure unless those rules would be applied retroactively to all defendants on collateral review.
Id. at 316.
In Miller, 132 S.Ct. at 2461, Kuntrell Jackson sought, through a petition for writ of habeas corpus, the announcement of a new constitutional rule. The Supreme Court announced a new constitutional rule in Miller, and applied it to Jackson, a defendant whose case was already final on direct appeal. Given the Teague Court’s holding above, it would appear that the Miller Court intended that the rule it announced be applied retroactively to all defendants on collateral review.[2]
*388 3. The Miller Court’s equating of a juvenile’s mandatory life-without-parole sentence to an adult death sentence signals a clear intention by the United States Supreme Court to apply Miller retroactively.
On the merits, I believe Miller should be applied retroactively and that the United States Supreme Court will ultimately hold the same. This conclusion is based upon a review of the cases relied upon by the Miller Court in announcing a new rule of law. The new law announced in Miller: A statutory scheme which mandates imposition of the maximum possible sentence upon a juvenile offender (life without parole) without the opportunity for the sen-tencer to consider any circumstances of the crime or of the criminal that mitigate against a sentence of life without parole, violates the Eighth Amendment to the United States Constitution.
The Supreme Court concluded that this new rule of law finds its roots in a line of cases arising in the death penalty context. Those cases, in summary, held: A statutory scheme which permits the imposition of the maximum possible sentence upon an adult offender (the death penalty) without the opportunity for the sentencer to consider all circumstances of the crime or of the criminal that mitigates against a sentence of death, violates the Eighth Amendment to the United States Constitution.
The Miller Court drew a direct analogy between the Eighth Amendment guarantees afforded to an adult offender sentenced to death and a juvenile offender sentenced to life without parole. The Miller Court began its discussion by referencing one particular aspect of Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). Graham held that the Eighth Amendment prohibits the imposi *389 tion of a life-without-parole sentence on a juvenile offender who did not commit a homicide. In so doing, the Graham Court equated a juvenile’s life-without-parole sentence to an adult sentence of death, since these are the maximum lawful sentences which can be imposed on the respective class of offenders.[3] The Miller Court expounded on this premise (citations omitted; all internal quotes are from Graham decision):
Graham makes plain these mandatory schemes’ defects in another way: by likening life-without-parole sentences imposed on juveniles to the death penalty itself. Life-without-parole terms, the Court wrote, “share some characteristics with death sentences that are shared by no other sentences.” Imprisoning an offender until he dies alters the remainder of his life “by a forfeiture that is irrevocable.” And this lengthiest possible incarceration is an “especially harsh punishment for a juvenile,” because he will almost inevitably serve “more years and a greater percentage of his life in prison than an adult offender.” The penalty when imposed on a teenager, as compared with an older person, is therefore “the same ... in name only.” All of that suggested a distinctive set of legal rules: In part because we viewed this ultimate penalty for juveniles as akin to the death penalty, we treated it similarly to that most severe punishment.
Miller, 132 S.Ct. at 2466 (emphasis added).
By equating, for Eighth Amendment purposes, a juvenile life-without-parole sentence to an adult death sentence, the Miller Court made relevant a series of death penalty decisions[4] which held that a statutory capital sentencing scheme, to pass constitutional muster under the Eighth Amendment, must be individualized to permit the sentencer to consider any circumstances that mitigate against a sentence of death and in favor of life in prison:
Graham’s “[t]reat[ment] [of] juvenile life sentences as analogous to capital punishment,” 560 U.S., at-, 130 S.Ct., at 2038-2039 (ROBERTS, C.J., concurring in judgment) — makes relevant here a second line of our precedents, demanding individualized sentencing when imposing the death penalty. In Woodson v. State, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944, we held that a statute mandating a death sentence for first-degree murder violated the Eighth Amendment. We thought the mandatory scheme flawed because it gave no significance to “the character and record of the individual offender or the circumstances” of the offense, and “exclud[ed] from consideration ... the possibility of compassionate or mitigating factors.” Id., at 304, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944. Subsequent decisions have elaborated on the requirement that capital defendants have an opportunity to advance, and the judge or jury a chance to assess, any mitigating factors, so that the death penalty is reserved only for the most culpable defendants commit *390 ting the most serious offenses. See, e.g., Sumner v. Shuman, 483 U.S. 66, 74-76, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987); Eddings v. Oklahoma, 455 U.S. 104, 110-112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Lockett v. Ohio, 438 U.S., at 597-609, 98 S.Ct. 2954, 57 L.Ed.2d 973 (plurality opinion).
Miller, 132 S.Ct. at 2467 (emphasis added).
In this series of death penalty cases (Lockett, Eddings, Woodson and Sumner) the United States Supreme Court struck down, as unconstitutional, statutory schemes which restricted or prohibited altogether the ability of the defendant to present, and the sentencer (judge or jury) to consider, mitigating circumstances in determining whether to impose a sentence of death or life.
The salient point for our purposes is that the rule established by this line of cases has been applied retroactively to cases already final on direct appeal, requiring the vacation of death sentences and a remand for a new sentencing proceeding at which the sentencer is permitted to consider any mitigating circumstances which might bear on the appropriate sentence of death or life. The Supreme Court’s reliance on this line of cases represents a clear indication of its intent to apply Miller retroactively.
For example, in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954 (1978), the defendant successfully challenged a statutory death penalty scheme in which the sen-tencer was prohibited from considering any mitigating circumstances other than the three circumstances expressly provided by statute.[5] Given the Supreme Court’s equating of a juvenile life-without-parole sentence to an adult sentence of death, the discussion in Lockett sheds light on the nature and significance of the Miller Court’s rejection of the mandatory sentencing scheme for juveniles facing life-without-parole sentences. Keep in mind that, given Roper’s elimination of death as a possible punishment, life without parole serves as the maximum possible sentence for a juvenile offender.
The Lockett Court began its discussion by
recognizing that the concept of individualized sentencing in criminal cases generally, although not constitutionally required, has long been accepted in this country. See Williams v. New York, 337 U.S., at 247-248, 69 S.Ct., at 1083; Pennsylvania ex rel. Sullivan v. Ashe, 302 U.S., at 55, 58 S.Ct., at 60. Consistent with that concept, sentencing judges traditionally have taken a wide range of factors into account.... And where sentencing discretion is granted, it generally has been agreed that the sentencing judge’s “possession of the fullest information possible concerning the defendant’s life and characteristics” is “[hjighly relevant — if not essential— [to the] selection of an appropriate sentence....” Williams v. New York, supra, 337 U.S., at 247, 69 S.Ct., at 1083.
The opinions of this Court going back many years in dealing with sentencing in capital cases have noted the strength of the basis for individualized sentencing. *391 For example, Mr. Justice Black, writing for the Court in Williams v. New York, supra, at 247-248, 69 S.Ct., at 1083—a capital case — observed that the “whole country has traveled far from the period in which the death sentence was an automatic and commonplace result of convictions — even for offenses today deemed trivial.”
Ten years later, in Williams v. Oklahoma, supra, 358 U.S., at 585, 79 S.Ct., at 426, another capital case, the Court echoed Mr. Justice Black, stating that “[i]n discharging his duty of imposing a proper sentence, the sentencing judge is authorized, if not required, to consider all of the mitigating and aggravating circumstances involved in the crime.”
Although legislatures remain free to decide how much discretion in sentencing should be reposed in the judge or jury in noncapital cases, the plurality opinion in Woodson, after reviewing the historical repudiation of mandatory sentencing in capital cases, 428 U.S., at 289-298, 96 S.Ct., at 2984-2988, concluded that “in capital cases the fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.” Id., at 304, 96 S.Ct., at 2991.
That declaration rested “on the predicate that the penalty of death is qualitatively different” from any other sentence. Id., at 305, 96 S.Ct., at 2991. We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed. The mandatory death penalty statute in Woodson was held invalid because it permitted no consideration of “relevant facets of the character and record of the individual offender or the circumstances of the particular offense.” Id., at 304, 96 S.Ct., at 2991.
Lockett, 438 U.S. at 602-604, 438 U.S. 586.
The United States Supreme Court in Lockett concluded that:
the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.
Id. at 604.[6]
4. The new rule announced in Miller is based upon a series of decisions which have been applied retroactively by the Florida Supreme Court.
The very cases relied upon by the Miller Court in announcing the new rule (Lockett, *392 Eddings, Woodson and Sumner) have themselves been applied retroactively by the Florida Supreme Court. In Riley v. Wainwright, 517 So.2d 656, 657 (Fla.1987), the Florida Supreme Court held Lockett is to be applied retroactively:
Lockett clearly is retroactive as it applies to the sentencing judge. The United States Supreme Court repeatedly has vacated death sentences imposed prior to Lockett by procedures forbidden by Lockett. (Citations omitted). This Court likewise has applied Lockett to vacate death sentences imposed before Lockett was decided. E.g., Perry v. State, 395 So.2d 170, 174 (Fla.1980). The Eleventh Circuit Court of Appeals has expressly held Lockett to be retroactive. Songer v. Wainwright, 769 F.2d 1488, 1489 (11th Cir.1985) (en banc), cert. denied, Dugger v. Songer, 481 U.S. 1041, 107 S.Ct. 1982, 95 L.Ed.2d 822 (1987).... Thus, a judge who fails to consider or is precluded from considering nonstatutory mitigating circumstances commits reversible error whether sentence was imposed post-or pre-Lockett.
In Harvard v. State, 486 So.2d 537 (Fla.1986), the defendant was convicted of first-degree murder and sentenced to death. After his conviction and sentence were final on direct appeal, Harvard sought collateral relief based upon Lockett, alleging that the trial court limited its consideration of mitigating circumstances to those set forth in the capital sentencing statute. The Florida Supreme Court agreed with the reasoning of those federal court decisions holding Lockett should be applied retroactively:
It is our independent view that an appellant seeking postconviction relief is entitled to a new sentencing proceeding when it is apparent from the record that the sentencing judge believed that consideration was limited to the mitigating circumstances set out in the capital sentencing statute in determining whether to impose a sentence of death or life imprisonment without parole for twenty-five years.
Id. at 539.
This retroactive application of Lockett was reaffirmed in Foster v. State, 518 So.2d 901 (Fla.1987). After his conviction and death sentence were final on direct appeal, Foster filed a motion for postcon-viction relief, asserting that the sentencing proceeding violated Lockett and Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987)[7], because the penalty phase jury was not instructed that it could consider nonstatutory mitigating circumstances in rendering its advisory sentence, and the trial court believed it was not permitted to consider nonstatutory mitigating circumstances in determining the sentence. The Florida Supreme Court, quoting Harvard, held that a “new sentencing proceeding is mandated ‘when it is apparent from the record that the sentencing judge believed that consideration was limited to the mitigating circumstances set out in the capital sentencing statute....’“ Id. at 902 (quoting Harvard, *393 486 So.2d at 589). The court vacated the death sentence and remanded the case “for a new sentencing proceeding at which all mitigating evidence may be presented to the judge and jury.” Foster, 518 So.2d at 902. In doing so, the court noted the State’s argument that this Lockett claim was procedurally barred — an argument, in essence, that Foster could not seek retroactive application of Lockett.[8] The court rejected this argument: “This Court has settled that question adversely to the state in Riley v. Wainwright, 517 So.2d 656 (Fla.1987).” Id. at 902 n. 3.
To summarize, three significant points follow from this discussion:
First, the Miller Court has equated life-without-parole juvenile sentences with adult capital punishment. In doing so, the Court has made relevant those decisions announcing the rule that the Eighth Amendment requires individualized sentencing decisions, permitting the defendant to present, and the sentencer to consider, evidence of mitigation before imposing sentence.
Second, our Florida Supreme Court has held that the rule announced by these decisions is to be applied retroactively to cases already final on direct appeal.
Third, the statutory scheme at issue in Geter is even more restrictive than the death penalty scheme found unconstitutional in cases such as Lockett and Hitchcock (and applied retroactively by the Florida Supreme Court in Riley, Harvard and Foster). In Lockett and Hitchcock, the statutes at issue permitted the sen-tencer to consider some mitigating cireum-stances (though only those mitigating circumstances expressly provided by statute). In Miller, the statute prohibited the defendant from presenting, and the sentencer from considering, any mitigating circumstances whatsoever. The sentence of life without parole is mandatory, regardless of the existence or weight of any mitigating circumstances. Given that a life-without-parole sentence for juveniles has been equated with an adult sentence of death, the Eighth Amendment’s requirement of individualized sentencing — as retroactively applied following the new rule in Lockett— must be applied retroactively in Miller.

5. Miller constitutes a development of fundamental significance, not a mere evolutionary refinement of the law and, under Witt, should be applied retroactively.

In determining whether the rule announced in Miller is a development of fundamental significance or a mere evolutionary refinement in the law, we apply the test announced in Witt v. State, 387 So.2d 922 (Fla.1980). Under Witt, a change of law will not be applied retroactively “unless the change: (a) emanates from [the Supreme Court of Florida] or the United States Supreme Court, (b) is constitutional in nature, and (c) constitutes a development of fundamental significance.” Id. at 931.
As the panel opinion notes, the first two factors are satisfied. The third factor requires us to determine whether Miller is one of those “fundamental and constitutional law changes which cast serious *394 doubt on the veracity or integrity of the original trial proceeding.” Witt, 387 So.2d at 929. In answering this question, we must consider and apply the following factors:
a. The Purpose to be Served by the New Rule
b. The Extent of Reliance on the Old Rule
c. The Effect on the Administration of Justice of a Retroactive Application of the New Rule
a. The Purpose to be Served by the New Rule
The panel opinion in Geter found that the rule announced in Miller was a “procedural change in the law that provides for a new process in juvenile homicide sentencing.” Geter, 115 So.3d 375, 378, 2012 WL 4448860 at *3 (Fla. 3d DCA Sept.27, 2012). The panel opinion likened Miller to those cases which do not affect the determination of guilt or innocence and do not address a miscarriage of justice or effect a judicial upheaval regarding substantive criminal law. Geter thus concluded that Miller represented a mere evolutionary refinement in criminal law, rather than a development of fundamental significance.
In reaching this conclusion, the panel analogized the rule in Miller to the rule announced in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).[9] There are two flaws in this analysis: first, the rule announced in Appren-di[10] is different in kind from the rule announced in Miller and therefore defies effective comparison. Second, the panel opinion failed to address the very line of cases Miller relied upon in creating this new rule (Lockett, Eddings, Sumner and Woodson) — cases which announced a rule more closely analogous to that announced in Miller, and (as previously discussed) which the Florida Supreme Court has applied retroactively as a development of fundamental significance.
In Apprendi, the defendant was charged with possession of a firearm for an unlawful purpose, which carried a maximum sentence of ten years. New Jersey’s hate crime law, however, provided for an enhanced sentence of up to twenty years if the trial judge found, by a preponderance of the evidence, that the defendant committed the crime “with a purpose to intimidate an individual ... because of ... race.” Id. at 468. Apprendi pleaded guilty, and the prosecutor thereafter sought an enhanced sentence based upon the hate crime provision. The trial court found that the shooting was racially motivated and imposed an enhanced sentence of twelve years. The United States Supreme Court struck down the statutory scheme, holding:
Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. With that exception, we endorse the statement of the rule set forth in the concurring opinions in [Jones v. United States, 526 U.S. 227, 252-53, 119 S.Ct. 1215 (1999)] “[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the *395 prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt.”
Id. at 490.
The rule announced in Apprendi is unlike the rule announced in Miller. Ap-prendi dealt with the Sixth Amendment right to have a jury, rather than the judge, make a determination of any fact which could subject a defendant to a sentence that exceeds the statutory maximum. Thus the issue in Apprendi was who should be the factfinder — judge or jury. In Hughes v. State, 901 So.2d 837 (Fla.2005), the Florida Supreme Court, applying Witt, held that the rule announced in Apprendi does not apply retroactively. In its analysis of the purpose to be served by the rule, the Hughes Court observed:
The decision in Apprendi was intended to guard against erosion of the Sixth Amendment’s guarantee of the right to jury trial, by requiring that a jury decide the facts supporting a sentence that exceeds the statutory maximum. See [Apprendi,] 530 U.S. at 483, 120 S.Ct. 2348, 147 L.Ed.2d 435. That rule is procedural, as is clear from the Supreme Court’s statement that its concern was with the adequacy of New Jersey’s criminal procedure. 530 U.S. at 475, 120 S.Ct. 2348, 147 L.Ed.2d 435 (“The substantive basis for New Jersey’s enhancement is thus not at issue; the adequacy of New Jersey’s procedure is.”); see also id. at 484, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (describing the reasonable doubt standard as a type of criminal procedure protection); Curtis v. United States, 294 F.3d 841, 843 (7th Cir.) (noting that “Apprendi is about nothing but procedure-who decides a given question (judge versus jury) and under what standard (preponderance versus reasonable doubt)”), cert. denied, Curtis v. United States, 537 U.S. 976, 123 S.Ct. 451, 154 L.Ed.2d 334 (2002). The Court affirmed this understanding in Ring v. Arizona, 536 U.S. 584, 605, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which applied Apprendi to death penalty cases, when it characterized Apprendi as determining “ ‘who decides,’ judge or jury.” * * * The effect of the rule is solely to shift factfinding responsibility from the judge to the jury and to increase the burden of proof for those facts that increase the penalty for a crime beyond its statutory maximum. See Summerlin, 124 S.Ct. at 2523. (“Rules that allocate decisionmaking authority in this fashion are prototypical procedural rules, a conclusion we have reached in numerous other contexts.”); United States v. Sanders, 247 F.3d 139, 148 (4th Cir.) (stating that the Apprendi rule “merely shifts the fact-finding duties from an impartial judge to a jury”), cert. denied, Sanders v. United States, 534 U.S. 1032, 122 S.Ct. 573, 151 L.Ed.2d 445 (2001).
Id. at 841.
By contrast, the rule established in Miller is not merely procedural, but embodies a substantive constitutional right that a sentencer may not impose upon a juvenile the harshest punishment allowed by law unless and until the juvenile is permitted the opportunity to present (and the sen-tencer consider) evidence of circumstances which might warrant a sentence of something less than life without parole. Ap-prendi simply invalidated an old rule which utilized the incorrect factfinder. Miller invalidated a rule that prohibited altogether any factfinding process and determination of an appropriate, individualized sentence.
This distinction is important, because it relates to the reliability and accuracy, and *396 therefore the integrity and fundamental fairness, of the old rule. The Hughes Court addressed this issue as well, noting that the rule announced in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 158 L.Ed.2d 556 (2002),[11] like Apprendi, merely determined who should be the factfin-der — the judge or jury. The United States Supreme Court, in Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) held Ring was not retroactive. The Hughes Court explained the reasoning for Summerlin’s determination of non-retroactivity:
The Court in Summerlin considered whether the holding in Ring, which applied the Apprendi rule to death penalty cases, applied retroactively. Stating that rules “that regulate only the manner of determining the defendant’s culpability are procedural,” the Court held that the rule announced in Ring was procedural. Id. at 2523. The Court explained that because judicial fact-finding does not senously diminish the reliability or accuracy of the fact-finding process, the earlier procedure by which judges found the facts relevant to sentencing is not fundamentally unfair. Id. at 2525.
Hughes, 901 So.2d at 843.
The old rule invalidated in Miller did “seriously diminish the reliability or accuracy of the fact-finding process” and was fundamentally unfair, because there was no factfinding process whatsoever, and thus no ability to mete out a proportionate, individualized sentence. This is the fatal infirmity with the statutory scheme invalidated in Miller. If the rule invalidated in Lockett and Hitchcock (allowing a jury or judge to consider a limited number of statutory mitigating circumstances) is fundamentally unfair, how can anyone reasonably contend that the old rule invalidated in Miller (mandating life without parole without consideration of any mitigating circumstances) was reliable, accurate or fundamentally fair?
While it is true, as the panel asserts, that Miller provides “a new process in juvenile homicide sentencing,” it does much more than this, and the description fails to fully explore the significant purpose underlying the new rule. The underpinning of the new rule seeks to ensure preservation of the Eighth Amendment’s requirement of fair, accurate, and individualized sentencing when a juvenile faces the most severe sanction that can be imposed under the law. Its purpose is premised first upon the Supreme Court’s determination that a life-without-parole sentence for a juvenile is the equivalent of an adult sentence of death. It follows therefrom that the rationale for requiring individualized sentencing where an adult faces a possible sentence of death applies with equal force to a juvenile who faces a possible sentence of life without parole:
A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstance of the particular offense excludes from consideration in fixing the ultimate punishment of [life without parole for juveniles] the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of [life without parole for juveniles].
*397 While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of [life without parole for juveniles].
Woodson, 428 U.S. at 304.
The rule announced in Apprendi — and Geter’s apples-to-oranges comparison with the rule in Miller — is thus largely unhelpful and serves as a poor barometer against which to evaluate retroactive application of the rule in Miller. A more helpful (and more closely analogous) comparison is to those new rules announced in Lockett, Ed-dings, Woodson and Sumner, which I have discussed supra. Given the United States Supreme Court’s correlation and extension of the reasoning in those cases to its decision in Miller, and the fact that the rules established in those cases have been applied retroactively by the Florida Supreme Court, it appears that Miller is a fundamental change in the law and should be applied retroactively.
This conclusion finds support in cases applying, retroactively, the rule announced in Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). In Hitchcock, the United States Supreme Court vacated a death sentence and remanded for a new sentencing proceeding because the jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances. In Thompson v. Dugger, 515 So.2d 173 (1987), the Florida Supreme Court applied Hitchcock to grant relief even though Thompson’s case was final on direct appeal at the time of the Hitchcock decision:
In Witt v. State, we held that only a state supreme court or the United States Supreme Court can effect a sufficient change of law to merit a subsequent post-conviction challenge to a final conviction and sentence.... We find that the United States Supreme Court’s consideration of Florida’s capital sentencing statute in its Hitchcock opinion represents a sufficient change in the law that potentially affects a class of petitioners, including Thompson, to defeat the claim of a procedural default.
Thompson, 515 So.2d at 175 (citations omitted) (emphasis added). See also Hall v. State, 541 So.2d 1125, 1126 (Fla.1989), receded from on other grounds in Coleman v. State, 64 So.3d 1210 (Fla.2011), (holding “as we have stated on several occasions, Hitchcock is a significant change in the law, permitting defendants to raise a claim under that case in postcon-viction proceedings”) (emphasis added); Cooper v. Dugger, 526 So.2d 900 (Fla.1988) (vacating death sentence and remanding for new sentencing proceeding before a jury upon retroactive application of Hitchcock and Lockett); Downs v. Dugger, 514 So.2d 1069 (Fla.1987) (staying death warrant, vacating death sentence, and remanding for new sentencing proceeding before a jury upon retroactive application of Hitchcock); McCrae v. State, 510 So.2d 874 (Fla.1987) (vacating death sentence and remanding for new sentencing proceeding by the trial court upon retroactive application of Hitchcock).
b. The Extent of Reliance on the Old Rule
The Geter panel noted that the “old rule has been longstanding and strongly relied upon by Florida trial and appellate courts. Florida law has long permitted courts to impose life sentences on juveniles tried as *398 adults after conviction of first-degree murder.” Geter, 115 So.3d 375, 382-83, 2012 WL 4448860 at *7 (Fla. 3d DCA Sept.27, 2012). However, the old rule at issue (and the one struck down by Miller) is not one which permitted imposition of a discretionary life-without-parole sentence on a juvenile; the old rule required imposition of a mandatory life-without-parole sentence on a juvenile. The rule announced in Miller does not prohibit altogether a life-without-parole sentence for juveniles. Rather, it prohibits a statutory scheme which mandates such a sentence without the ability of the defendant to present, and the sentencer to consider, evidence of mitigating circumstances to inform an individualized sentencing determination. The statutory scheme struck down in Miller (§ 775.082(1), Fla. Stat. (2012)) has been in existence only since May 25, 1994. See Ch. 94-228, § 1, Laws of Fla. (1994). Pri- or to that date, any defendant receiving a mandatory life sentence could become parole eligible after serving twenty-five years in prison. Thus the old rule was in existence for 18 years before the Miller decision and only six years before the crime was committed by Geter.[12]
Further, the Supreme Court in Miller cited a study which indicated that, as of 2009, only 266 cases in Florida involved a juvenile offender who received a mandatory life-without-parole sentence. See Miller, 132 S.Ct. at 2471 n. 10 (citing www. hrw.org/news/2009/10/02/ state-distribution-juvenile-offenders-servingjuvenile-life-without-parole). This finite and relatively small number would appear to undercut any conclusion that the old rule is longstanding and strongly relied upon by the Florida courts.
c. The Effect on the Administration of Justice of a Retroactive Application of the New Rule
The Florida Supreme Court has held that, in undertaking a Witt analysis to determine retroactive application of a new rule, “the fundamental consideration is the balancing of the need for decisional finality against the concern for fairness and uniformity in individual cases.” Johnson v. State, 904 So.2d 400, 408 (quoting State v. Callaway, 658 So.2d 983, 986 (Fla.1995)).
It is difficult to overstate the importance of decisional finality in the criminal justice system. Finality provides the requisite stability for the proper and reliable administration of our criminal justice system. Disruption of that process, by application of a new rule to a case already final on direct appeal, concededly “casts a cloud of tentativeness over the criminal justice system.” Witt v. State, 387 So.2d at 925. However, retroactive application of any new rule will always impact decisional finality to some degree. Therefore, we must consider and weigh the nature and extent to which this particular rule will cause a disruption of that process, and the nature and extent of its effect upon finality. Balanced against those important interests are the equally important interests in a statutory sentencing determination that is accurate, reliable and fundamentally fair.
The retroactive application of the new rule undoubtedly will have some effect (both positive and negative) on the administration of justice, and will certainly impose some burden on the justice system as a result of required resentencing hearings. The panel in Geter describes this effect as “far-reaching and adverse.” I cannot *399 agree with this characterization. As of June 30, 2009, there were 100,894 inmates housed in Florida’s prisons.[13] In 2009, the potential pool of affected inmates was 266, or approximately .26% of Florida’s current inmate population. None of the affected sentences could have been imposed before 1994, when the statutory scheme became effective. This can hardly be characterized as a “floodgate” situation.
Further, retroactive application will not require a new trial, a redetermination of guilt, or any proceeding before, or determination by, a jury. The convictions in these cases will remain undisturbed, lessening any concern regarding lost records, dead or unavailable witnesses, or similar issues which might be raised if retroactive application would require a new trial proceeding. The rule announced in Miller would require only a new sentencing proceeding at which the defendant would be given the opportunity to present mitigating evidence to the trial court, and the trial court would be required to consider this mitigating evidence in fashioning the appropriate individualized sentence, which could include life without parole.
Importantly, the sentencing proceeding required by Miller is defense-centric, providing the defendant with an opportunity to present mitigating evidence to the trial judge. The State is not required to call any witnesses or present any evidence. This lessens the likelihood of any adverse impact upon the State which might otherwise result from the passage of time and the unavailability of witnesses or other evidence. I do not ignore the possibility that, at a new sentencing hearing, the State may have the right to oppose or rebut the mitigating evidence offered by a defendant,[14] requiring the State to retrieve old records which may be lost or destroyed, or to locate witnesses who are unavailable or whose whereabouts are presently unknown. Also, the original prosecutor and original judge might not be available for the new sentencing hearing, creating other logistical problems and requiring the new judge to review the trial transcripts before imposing sentence. These are legitimate concerns, and there is little doubt that in such cases some significant burden will be placed upon the State, the next of kin, and other participants in the new sentencing proceeding.
Nevertheless, the sentencing hearing required by Miller (and the potential adverse impact) is a far cry from the new penalty phase proceedings which were required in the wake of a retroactive application of the rule announced in cases such as Lockett and Hitchcock. The retroactive application of Lockett and Hitchcock resulted in a remand for: the selection and empanelling of an entirely new penalty phase jury; a penalty phase proceeding in which the State was required to present testimony and other evidence of aggravating circumstances;[15] the defense was permitted to present evidence and other evidence of mitigating circumstances; closing arguments, and sequestered deliberations *400 of the jury;[16] the rendition of an advisory sentence by the penalty phase jury; the trial court’s preparation of a written sentencing order; followed by the pronouncement and imposition of a sentence of either life in prison or death.
As can be seen, the adverse impact on the administration of justice which followed a retroactive application of Lockett and Hitchcock was significantly more burdensome than that which would follow from a retroactive application of Miller. Nevertheless, the Florida Supreme Court determined that Lockett and Hitchcock should apply to defendants whose cases were already final on direct appeal.
Given the relatively small number of cases involved, the defense-centric nature of a Miller resentencing proceeding, and the consequently lessened concern over the State’s inability to retrieve records and locate witnesses, I do not believe the adverse impact of retroactive application of Miller can fairly be characterized as “far-reaching and adverse.”
Balanced against this adverse effect is the beneficial effect from a sentencing scheme which treats, individually, all juvenile offenders facing a possible life-without-parole sentence, and which ensures that defendants whose cases were final when Miller was decided will still receive a fair, accurate, reliable and individualized sentencing determination consistent with the proportionality requirements of the Eighth Amendment.
In terms of accuracy, reliability and fairness, it is self-evident that the balance of these interests weighs in favor of retroactive application. There is no “accuracy” or “reliability” in a sentencing scheme that prohibits individualized consideration of the crime or the criminal. There is only a single, all-encompassing, non-discretionary penalty. One might argue that the old rule was “fair” in the sense that it treated everyone the same. This is not fairness. Removing all discretion from a decision which is inherently discretionary; mandating uniformity for a decision that is historically individualized; and prohibiting any factfinding in a process that is necessarily fact intensive, does not make the process “fair.” It simply makes it equally unfair. These characteristics of the old rule prevent any genuine assessment of accuracy or reliability, and nullify any notion of fairness. As the Supreme Court, in the death penalty context, noted in Eddings:
[T]he rule in Lockett followed from the earlier decisions of the Court and from the Court’s insistence that capital punishment be imposed fairly, and with reasonable consistency, or not at all. By requiring that the sentencer be permitted to focus “on the characteristics of the person who committed the crime,” the rule in Lockett recognizes that “justice ... requires ... that there be taken into account the circumstances of the offense together with the character and propensities of the offender.” By holding that the sentencer in capital cases must be permitted to consider any relevant mitigating factor, the rule in Lock-ett recognizes that a consistency produced by ignoring individual differences is a false consistency.
Eddings, 455 U.S. at 112 (internal citations omitted).
*401 The Miller Court applied these same principles to the juvenile life-without-parole context, holding that a mandatory sentence of life without parole creates the risk (indeed, I would posit, ensures the eventuality) that some juvenile offenders will receive a disproportionate and excessive sentence:
The Eighth Amendment’s prohibition of cruel and unusual punishment “guarantees individuals the right not to be subjected to excessive sanctions.” Roper v. Simmons, 543 U.S. [551], at 560, 125 S.Ct. 1183, 161 L.Ed.2d 1. That right, we have explained, “flows from the basic ‘precept of justice that punishment for crime should be graduated and proportioned’ ” to both the offender and the offense. Ibid.
Miller, 132 S.Ct. at 2463 (other citations omitted).
By making youth (and all that accompanies it) irrelevant to the imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment.
Id. at 2469.
Before condemning a juvenile to a sentence he can complete only upon his death, our society and our criminal justice system has a compelling interest in ensuring that the defendant have the opportunity to present, and the trial judge the discretion to consider, individual circumstances that might warrant some lesser sentence. In doing so, we provide an accurate and reliable sentencing process that gives substance to the Eighth Amendment’s concept of proportionate punishment. By applying such a rule to all juvenile defendants, including those whose conviction and sentence are already final, we surely enhance society’s confidence in a system that is not merely efficient or uniform, but is also fair, accurate and reliable.
The ideals of fairness, accuracy and reliability often defy measurement, but no one can reasonably question the significance of both actual fairness and society’s perception of fairness in the effective administration of justice and the accuracy, reliability and integrity of the criminal sentencing process.
For these reasons, I respectfully dissent from the denial of Appellant’s motion for rehearing en banc and for certification to the Florida Supreme Court of a question of great public importance.
WELLS, C.J., and SUAREZ and SHEPHERD, JJ., concur.

. Under section 775.082, the only possible punishments for first-degree murder are death or life without parole. In Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the United States Supreme Court held that the Eighth Amendment forbids imposition of the death penalty on offenders who were under the age of eighteen when their crimes were committed. Thus, after Roper, the only lawful sentence which could have been imposed on Geter was a mandatory sentence of life without the possibility of parole. As a result of the decisions in Roper and Miller, there is currently no lawful sentence provided by Florida statute for a juvenile who is convicted of first-degree murder.

. I recognize of course that the United States Supreme Court and the federal courts determine the question of retroactivity by applying the standard established in Teague, 489 U.S. at 310, 109 S.Ct. 1060 (1989), while Florida courts continue to apply the Witt standard. See Witt v. State, 387 So.2d 922 (Fla.1980). Should the United States Supreme Court determine Miller is retroactive as a "watershed” rule of criminal procedure (applying a Teague analysis) Florida courts will be duty-bound to apply Miller retroactively, since we must give *388 federal constitutional rights at least as broad a scope as the United States Supreme Court requires.
Should the United States Supreme Court find Miller is not retroactive, the Florida Supreme Court (applying Witt) may still find that Miller should be applied retroactively. See Johnson v. State, 904 So.2d 400, 409 (Fla.2005) (observing that the Witt standard "provides more expansive retroactivity standards than those adopted in Teague "). See also Danforth v. Minnesota, 552 U.S. 264, 266, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008) ("The question in this case is whether Teague constrains the authority of state courts to give broader effect to new rules of criminal procedure than is required by that opinion. We have never suggested that it does, and now hold that it does not.”).
I believe this case presents another opportunity for the Florida Supreme Court to reconsider its continued adherence to the Witt standard, and to instead adopt the Teague standard in instances such as this, where the newly-announced rule of law emanates from the United States Supreme Court and is premised upon a federal constitutional right. The Witt standard adopted the retroactivity analysis first announced in Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), and later applied in Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), a paradigm abandoned nearly twenty-five years ago by the United States Supreme Court decision in Teague. See Witt v. State, 387 So.2d at 926 ("in determining whether a new law constitutes a change of "fundamental significance” warranting retroactive application, Florida Supreme Court considers the three Linklet-ter/Stovall factors: (a) the purpose to be served by the new rule; (b) the extent of reliance on the old rule; and (c) the effect on the administration of justice of a retroactive application of the new rule”). The application of a Witt analysis to a new rule founded upon a federal constitutional right will engender uncertainty and unpredictability as the issue of Miller’s retroactivity winds its way through the federal courts, where it will be analyzed under the Teague standard. I echo (and will not repeat) the analysis set forth by then-Justice Raoul Cantero in Windom v. State, 886 So.2d 915, 941-45 (Cantero, J., specially concurring) urging the Supreme Court to abandon the Witt standard in favor of Teague where the newly-announced rule of law emanates from the United States Supreme Court and is premised upon a federal constitutional right.

.Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), held that the Eighth Amendment prohibits imposition of the death penalty on offenders who were under the age of eighteen when their crimes were committed. Thus, after Roper, the maximum sentence which can be imposed on a juvenile is life without the possibility of parole.

.Sumner v. Shuman, 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

. Under Ohio law, once the jury returned a verdict finding the defendant guilty of aggravated murder, the trial judge was required to impose a sentence of death unless, after considering the nature and circumstances of the offense and a defendant's history, character, and condition, the trial judge found one of three statutory mitigating circumstances: (1) the victim had induced or facilitated the offense; (2) it was unlikely that the defendant would have committed the offense but for the fact that the defendant "was under duress, coercion, or strong provocation;” or (3) the offense was "primarily the product of the defendant's psychosis or mental deficiency.” Lockett, 438 U.S. at 593-94.

. Although Lockett was a plurality opinion, the Lockett holding and reasoning set forth above was adopted by a majority of the Court in Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). In doing so, the Eddings Court held:
We find that the limitations placed by [the Oklahoma trial and appellate] courts upon the mitigating evidence they would consider violated the rule in Lockett. Just as the State may not by statute preclude the sen-tencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf. The sen-tencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.
Id. at 113-115.

. Lockett involved Ohio's capital sentencing statute in which the judge served as the sen-tencer. The court in Lockett held the statutory scheme unconstitutional because it prohibited the sentencing judge from considering any nonstatutory mitigating circumstances.
Hitchcock involved Florida’s capital sentencing statute, in which- the penalty phase jury renders an advisory sentence, followed by the trial judge’s independent review, determination, and imposition of a sentence of death or life imprisonment. Relying upon Lockett and Eddings, the United States Supreme Court in Hitchcock struck down this capital sentencing scheme because it precluded the jury (in rendering an advisory sentence) and the judge (in determining the sentence) from considering any nonstatutory mitigating circumstances.

. At the time of the decision in Foster, capital postconviction relief was governed by Florida Rule of Criminal Procedure 3.850 (1987), which provided in pertinent part:
A motion to vacate a sentence may be filed at any time. No other motion shall be filed or considered pursuant to this rule if filed more than two years after the judgment and sentence become final unless it alleges ... the fundamental constitutional right asserted was not established within the period provided for herein and has been held to apply retroactively.

. The Florida Supreme Court, in Hughes v. State, 901 So.2d 837 (Fla.2005) applied the Witt analysis and concluded that Apprendi should not be applied retroactively.

. In Apprendi, the U.S. Supreme Court struck down a statutory scheme that permitted the judge (applying a preponderance standard), rather than the jury (applying a reasonable doubt standard), to determine the existence of any fact that increases the possible penalty beyond the statutory maximum. Id. at 491.

. Ring was the sister case to Apprendi, and extended Apprendi s holding to capital cases, requiring that the jury, not the judge, determine whether an aggravating circumstance exists, thus making a defendant eligible for the death penalty.

. Geter's crime was committed in 2000, six years after the creation of the mandatory life-without-parole statute.

. See http://www.dc.state.fl.us/pub/annual/ 0809/stats/im_pop.html (last visited Feb. 26, 2013).

. The Miller Court offered no parameters regarding the nature or procedure for a re-sentencing under this new rule, and presumably left it to the states to do so.

. In addition to presenting testimony and other evidence of aggravating circumstances, the State is permitted to present relevant guilt phase testimony and evidence in order to familiarize the new penalty phase jury with the general facts and circumstances of the case, to enable the jury to render an appropriate advisory sentence. See Bonifay v. State, 680 So.2d 413, 419 (Fla.1996); Teffeteller v. State, 495 So.2d 744, 745 (Fla.1986).

. Florida Rule of Criminal Procedure 3.370 provides:
Absent exceptional circumstances of emergency, accident, or other special necessity or unless sequestration is waived by the state and the defendant, in all capital cases in which the death penally is sought by the state, once the jurors have retired for consideration of their verdict, they must be sequestered until such time as they have reached a verdict or have otherwise been discharged by the court.